**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GREGORY HAYNES,<br><br>*Plaintiff*,<br>v.<br><br>FAIRVIEW AVENUE PROPERTIES, LLC, *et al.*,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 23 C 1596<br><br>Chief Judge Virginia M. Kendall |

**<u>MEMORANDUM OPINION & ORDER</u>**

California resident Gregory Haynes brought a complaint alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c), (d), and various state-law claims. (Dkt. 27). It is one of 15[1] related cases, all in front of this Court, that Plaintiffs' attorneys have brought alleging that various overlapping Defendants engaged in a fraudulent real-estate investment scheme. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

Over the course of the litigation, numerous defendants settled in all of the related cases. Nonetheless, two separate sets of Defendants filed motions for summary judgment against Haynes: Defendant Kathleen Long (Dkt. 229) and Defendant Marcin Chojnacki along with related entities[2] (Chojnacki Defendants) (Dkt. 232). In this case, Plaintiff's Amended Complaint alleged that the Chojnacki (as well as some of the entities) and Long violated 18 U.S.C.§ 1962(c), (d), and that others of the Chojnacki entities violated 18 U.S.C.§ 1962(d). (Dkt. 29 ¶¶ 100–120).

---

[1] There were as many as 16 related cases, but one, *Ascot Specialty Insurance Company, A Rhode Island Corporation v. Midwest Title & Closing Services LLC et al*, 1:24-cv-05216, settled and closed on December 4, 2025.
[2] The Chojnacki Defendants include the following natural persons and entities: Marcin Chojnacki and the following entities: Citypoint Illinois LLC; EJ Investment Group, Inc.; Fairview Avenue Properties LLC; Mainstreet Property Management LLC; TCF National Holdings, Inc. (Dkt. 233 at 1 n.1).

For the below reasons, the Chojnacki Defendants' Motion for Summary Judgment and Long's Motion are granted in part and denied in part. The Motions are granted with regard to Plaintiff's attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants Long's Motion on Counts III, V, and VI. The Court also grants the Chojnacki Defendants' Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

## **BACKGROUND**

Related cases in this litigation have already made clear the shortcomings of the present record. To summarize some of the most pertinent issues discussed therein: Plaintiffs' attorneys regularly inserted entire paragraphs worth of fact into their 56.1 Response entries, routinely provided massive string cites that did not justify the stated assertions, and consistently inserted their legal allegations and conclusory assessments—including entire swaths of their expert reports—as statements of "fact," all of which the Court ignored. On multiple occasions. the Plaintiffs' attorneys cited to the allegations in the Complaint, rather than admissible evidence, in their 56.1 statements; multiple parties inappropriately admitted facts and then proceeded to provide further information in the response. The Defendants, meanwhile, routinely base their 56.1 statements on the plaintiffs' depositions in these cases and then proceed to object to plaintiffs' own citations to those exact same depositions—often the exact same *portion* of the depositions—as

inadmissible hearsay (though this characterization is frequently incorrect under the party-opponent admission exception under Federal Rule of Evidence 801(d)(2)(D)).

As made clear throughout the related cases, this Court has the discretion to deem admitted facts that either side does not expressly admit yet fails to dispute with citations to admissible evidence in the record. *See Dade v. Sherwin–Williams Co.*, 128 F.3d 1135, 1139 (7th Cir. 1997) (referring to L.R. 56.1's predecessor rule, the court affirmed the district court's taking as true uncontroverted facts alleged in the movant's statement and supported by references to the record); *see also Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) ("It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies."). The Court thus proceeds by crediting only those statements that are adequately supported in the record and relevant to the resolution of the Motions. As explicated in the related cases, Defendants' frequent objections to cited emails on authenticity and hearsay grounds are overruled unless indicated otherwise in the text of the Court's analysis. The few other objections relevant to material facts are addressed below, alongside the <u>relevant</u> facts (that are undisputed unless otherwise indicated).

## I. Background

The Court also, at this point, adopts the general background information established as undisputed in the related cases without repopulating the same record with new citations. That includes the following: (Former defendant) Chase Real Estate, LLC, owned and managed by Christian Chase, provided certain services to brokers for a fee, including allowing the brokers to use the www.mychaseagent.com domain and the mychaseagent.com email. Defendant Marcin Chojnacki ("Chojnacki") is a licensed real estate broker and was the designated managing broker

for the Chase RE Roselle branch during the relevant time period. Robert Rixer ("Rixer") was a real estate broker for Chase RE Roselle during the relevant time period. Former Defendant Laurena "Lori" Mikosz also was a real estate broker for Chase RE Roselle during the relevant time period.

Chojnacki and Rixer jointly own Market Equities, Inc., a Delaware Corporation formed in 2022; Market Equities, Inc. is the sole owner of Illinois Assets as well as EJ Investments (since 2022) which in turn owns Mainstreet Property Management. Defendant EJ Investments (EJ) was formed by Chojnacki and Rixer in 2020 and was initially owned by Chojnacki and his then-fiancé Long (who also share children); in 2022, Chojnacki and Rixer's Market Equities, Inc., assumed ownership of EJ. Chojnacki's mother, Iwona, is EJ's bookkeeper. Rixer, Chojnacki and Long are signers on the EJ Investment bank account. Rixer and Chojnacki also co-own Citypoint Illinois LLC and have both been brokers there since 2023; Rixer became the managing broker for Citypoint in 2023. The Chojnacki Defendants dispute that Long herself worked for Citypoint any earlier than April 2025. Rixer and Chojnacki also co-owned the now dissolved Illinois Assets LLC.

Long is involved in this action through her alleged involvement in some of the financial entities that Plaintiff argues make up the Citypoint/Citipoint Enterprise: now dissolved Defendant First National Financial (FNF), now dissolved entity Defendant TCF National Holdings (TCF), and Prairie Raynor. Long was the sole shareholder, officer and director of FNF prior to its dissolution on December 20, 2024; she was also the sole signatory on FNF's bank account. Although Rixer and Chojnacki created TCF, Long was the sole shareholder and officer of TCF via FNF; Long was also the sole signatory on the bank account and sole person who had authority to act on behalf of the bank account for TCF, (which Defendants disputed in some cases but admitted on the *Malik* docket (Dkt. 436 ¶ 16), so the Court considers it admitted. Through this organizational structure, Long was the face of TCF; a design that Plaintiff asserts was to conceal Rixer and

Chojnacki from the public record, whereas the Chojnacki Defendants assert was a decision made for branding purposes.

Former Defendant Rachel Irwin was an employee of Chojnacki's now dissolved Chojnacki Real Estate, Inc. corporation, and then an employee of former Defendant Midwest Title and Closing Services, which she co-owned with Chojnacki. Irwin was also General Counsel for Rixer and Chojnacki's EJ Investments and a shareholder of XYZABC, Inc., a Delaware corporation that she co-owned with Chojnacki. XYZABC, Inc. was the manager of Midwest Title and Closing Services. Via these entities, Irwin communicated with Chojnacki, Rixer, and Long's lenders, organized entities, prepared operating agreements and bylaws, amendments to bylaws and operating agreements, and other legal documents for Chojnacki, Rixer, Long and their entities; Irwin also acted as "Seller's" attorney for Chojnacki, Rixer, Long and their entities.

**II. The Haynes Connection**

With that, the Court turns to the facts that connect Haynes and this complicated web of actors. Haynes, newly retired and interested in investing in real estate, first reached out to Mikosz after seeing an Instagram/social media post. (Dkt. 240 ¶ 9; Dkt. 245 ¶ 56). Mikosz told him how her company had a management service and would manage the Properties for Haynes and "take care of any services" if he bought the Properties with them—essentially, a "one-stop shop." (Dkt. 240 ¶ 10). Mikosz also told him that there was a mom-and-pop sell that they would only talk with her regarding the sale of the Properties. (Dkt. 240 ¶ 12). Haynes testified that Mikosz told him she would make a call with her broker, "Marcin" [Chojnacki], as to next steps; Plaintiff now "denies that Chojnacki was Mikosz' broker" despite this direct quote from Haynes' deposition. (Dkt. 240 ¶ 12; Haynes Dep. at 47:10–48:15).

The properties that Haynes eventually purchased are located at 12430 Fairview Avenue and 12442 Fairview Avenue, both of which are in Blue Island, Illinois ("Properties"). (Dkt. 240 ¶ 7). Haynes testified that he hired an inspection be done on the Properties, whereupon he first visited the Properties. (Dkt. 240 ¶ 15). The appointment for the inspection that Haynes attended was set up and scheduled by Mikosz. (Dkt. 240 ¶ 15). Haynes testified he wanted to visit the Properties to make sure his investment was legit and with a "real business." (Dkt. 240 ¶ 15). During the inspection, Haynes was only able to see the outside of the Properties along with the common areas, but was unable to see inside the units, despite the fact that Mikosz told Haynes that he would be able to. (Dkt. 240 ¶ 17). Defendants assert that Haynes' attorney was able to see the inside of the units, which Plaintiff disputes. (Dkt. 240 ¶ 17).

After the inspection, Haynes first met with Chojnacki, which consisted of a background of Chojnacki and a general overview of the investment process and the team. (Dkt. 240 ¶ 18). Haynes testified the only other conversations he had with Chojnacki was when he was displeased with the property managers' work on the Properties, and Chojnacki tried finding a solution by replacing the project managers. (Dkt. 240 ¶ 19).

The lender's appraiser inspected the inside of the Properties and provided Haynes with appraisal reports. (Dkt. 240 ¶ 20). (As in other cases, Plaintiff contends that the document should not count as an appraisal because it refers to nearby comp properties for its estimates despite the fact that the "sales comparison approach is [often seen as] the most reliable method for appraising the value." *Buchanan Energy (N), LLC v. Lake Bluff Holdings, LLC*, 2017 WL 1232973, at *6 (N.D. Ill. Apr. 4, 2017); nevertheless, the argument that the report should be set aside by a factfinder does not bear on a factual statement about the report's contents.) The appraisal reports appraised the Properties for an equaled amount of the eventual purchase prices Haynes bought the

Properties for. (Dkt. 240 ¶ 20; Dkt. 241 ¶ 10). Haynes relied on the appraisal reports to inspect the units and, ultimately, determine that he would close on the Properties—even though later, after his repair costs were higher than what the appraisal quoted, he questioned in his deposition whether the appraisals were done honestly. (Dkt. 240 ¶ 21). Haynes confirmed he never met or spoke to the appraiser. (Dkt. 240 ¶ 21).

Haynes testified that he also had issues with the utility bills provided and the repairs and maintenance of the Properties. (Dkt. 240 ¶ 22). Additionally, Haynes had an issue with the property tax increases after the Properties were reassessed, which he testified was due to Mikosz stating that the property taxes of the Properties would not be reassessed. (Dkt. 240 ¶ 22). However, Haynes is not alleging property taxes as part of his damages. (Dkt. 240 ¶ 22).

Haynes testified that Mikosz provided the rent rolls of the Properties illustrating current occupancy and rent rates, and Haynes was aware he could increase the rent, though Plaintiff now disputes those documents could constitute rent rolls due to their purported inaccuracies. (Dkt. 240 ¶ 23). Further, at no point in the e-mail chain containing the rent rolls did Haynes or his attorney request any information pertaining to the delinquencies of rent payment. (Dkt. 240 ¶ 23).

Ultimately, Haynes purchased the Properties for $450,000 each, for a total of $900,000. (Dkt. 240 ¶ 27). Haynes testified that he had Mikosz negotiate for some credit based on the inspection reports and appraisal reports, which Mikosz successfully did. (Dkt. 240 ¶ 26). He further testified that Mikosz was a professional, but that she did not provide honest answers to his real estate questions about the Properties. (Dkt. 240 ¶ 28). Haynes reported in June of 2022 that he would terminate his relationship with Mainstreet as the property manager, which was terminated in December 2022. (Dkt. 240 ¶ 29). Haynes testified that at that point, Mikosz took over as the property manager, even though he recognized that Mikosz still worked for Chase. (Dkt. 240 ¶ 29).

Plaintiff now brings suit on the theory that while negotiating his deals, the Defendants were simultaneously executing their own secret purchases to flip a profit on Haynes by way of actors he understood to be acting in his best interest. Haynes confirmed that he still owns the Properties and is trying to "make it work" by doing the alleged "necessary repairs." (Dkt. 240 ¶ 30). Haynes testified that the Properties were in "bad condition" due to the lack of tenants, lack of collection of rent, increased cost of utilities, and that no maintenance work had been done on the Properties by Mainstreet. (Dkt. 240 ¶ 31). Essentially, Haynes testified that the Properties have "gone from bad to worse" as of 2023. (Dkt. 240 ¶ 32). Yet, Haynes confirmed that "[m]ost of the issues have been taken care of" due to "proper management." (Dkt. 240 ¶ 32). Haynes charges $1,200 a month for a one-bedroom unit, and $1,300 a month for a two bedroom unit, more in rent than the rent rolls originally provided by Mikosz. (Dkt. 240 ¶ 33). Haynes confirmed there are currently no vacant units in the Properties, and that all the new tenants make timely rent payments with no delinquencies. (Dkt. 240 ¶ 33). Haynes alleges that the Defendants never gave him his rent relief funds, such as an owed payment of $7,470; Defendants' ledger shows that the payment went to Haynes, but Plaintiff disputes he ever received it in his bank account. (Dkt. 240 ¶ 34).

It is undisputed that Defendants Long, Chojnacki, Rixer and former Defendant Sheth made a $1,200,000 acquisition of four Fairview buildings (that jointly appraised for $1,325,000 on Dec. 3, 2021) inclusive of Haynes' properties; Long (via TCF) took out a $803,400.00 mortgage for the acquisition. (*Michel*, Dkt. 246 ¶ 80, 248 ¶ 80; Dkt. 239, Ex. 63). Plaintiff alleges that Chojnacki had Haynes pay for the November 2021 inspection report that was actually for Chojnacki's earlier acquisition after which Chojnacki's name was replaced with Haynes' along with related Plaintiff Shankar, while Defendants note that there is no proof in the record that the inspection report supplied to Haynes was altered. (Dkt. 245 ¶ 73). Even so, in Shankar's case, discovery resulted in

an email in which Chojnacki directed Mikosz to alter the inspection report for the Fairview Property prior to giving it to Shankar by removing his name and changing the date from November 2, 2021, to March 8, 2022, the date of Chojnacki's email to Mikosz, which the Chojnacki Defendants dispute as simply wanting to "remain anonymous" and noting that Shankar never disputed the accuracy of the inspection report). (*Shankar* docket, Dkt. 297 ¶¶ 55–56).

Returning to the entities that actually purchased the Fairview Properties: Sheth served as manager of Former Defendant Mon Ami TCF, a joint venture between his Mon Ami companies and Long's TCF National Holdings. (Dkt. 245 ¶ 80; Dkt. 243 ¶ 80). The Fairview Properties were acquired by Mon Ami and Long's TCF. (Dkt. 245 ¶ 80; Dkt. 243 ¶ 80). TCF did not hold the title directly; Fairview Avenue Properties LLC did. (Dkt. 241 ¶¶ 5–6). The extent of TCF's actual involvement is disputed: Long asserts that Mon Ami TCF LLC, was the manager-member of the Fairview Avenue Properties LLC during the relevant time period, whereas Plaintiff asserts that TCF indirectly owned the properties and Long herself authorized numerous related transactions, while Sheth was not actually involved in the acquisition or sale. (Dkt. 241 ¶ 5). Plaintiff testified that he never met, spoke, communicated with Long directly. (Dkt. 241 ¶ 12).

Now, Haynes seeks $300,000 for the difference that the Defendants allegedly pocketed between purchasing the two properties and then selling them to Haynes, as well as $351,849 in back-end damages related to tenant issues and repairs. (Dkt. 240 ¶¶ 38-39). As throughout the related cases, Defendants take issue with the alleged back-end damages and allege that he has never provided a "detailed explanation or calculation," which Plaintiff disputes without further citation to the record; in his responses to interrogatories asking him to compute his claimed damages in this case, Haynes referred Defendants to the same "Master Spreadsheet" that Plaintiff's

counsel developed for all the related cases, as well as Haynes' entire production of documents. (Dkt. 240 ¶ 39).

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). "A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted).

## DISCUSSION

Haynes alleges that the Chojnacki Defendants (other than some of the entities) and Long violated § 1962(c), (d) and that the rest of the Chojnacki Defendant entities violated 18 U.S.C.§ 1962(d) and that others of the Chojnacki entities violated 18 U.S.C.§ 1962(d). (Dkt. 29

¶¶ 100–120).[3] Given the fact that the Defendants filed substantively comparable motions for summary judgment in all of the related cases, the Court assumes familiarity with the analysis laid out in *Malik et al v. Prairie Raynor LLC et al*, 23-cv-1182, and related dockets. Indeed, in this case, the Parties regurgitate their arguments with regard to the RICO claims almost verbatim, so the Court need not re-explicate its analysis on the same: there can be no "lost investment bargain" theory of RICO injury where the value of property sold is not as high as represented, but is at least what the Plaintiffs paid for it. On this record, nothing indicates that Haynes did not get the benefit of his bargain.

It is altogether different, however, to allege a RICO violation where the RICO scheme diminishes the actual value of property—in this case, Haynes's claims about back-end damages. Defendants contend that the Haynes's claims about additional costs, repairs, and delinquent tenants are insufficient and vague, but those arguments speak not to the validity of a claimed injury for RICO standing purposes and instead go to the scope of damages (if any), a query that is best fit for a jury's resolution. While "logically related, a property interest and a measure of damages are not the same thing." *See Ivar v. Elk River Partners, LLC*. 705 F. Supp. 2d 1220, 1234 (D. Colo. 2010). Thus, Haynes's claims can proceed on the alleged financial injuries descending from the representations made around the actual transaction. The Chojnacki Defendants' other general attempts to argue that any bad acts were Mikosz' alone and that there was no enterprise falls flat on the same grounds as explained in the related cases. A full review of the record, including facts contested and uncontested, could conceivably allow a reasonable jury to find that the Chojnacki Defendants participated in the operation or management of an enterprise to lure in investors

[33] The Complaint says "18 U.S.C. 1962(c), (d)," for these Defendants, but does not discuss the specific conspiracy aspect; nevertheless, the Complaint clearly indicates where some of the entities are only facing allegations under § 1962(d).

through misrepresentations of building ownership, condition, and—with regard to tenants—its occupancy and rental rates.

The Court next turns to Long's primary contention in support of her Motion: that Long is insufficiently connected to the Fairview Properties to support a claim in this case. (Dkt. 229-1 at 5–6). Long suggests that former defendant Sheth and former defendant Mon Ami TCF LLC—now dismissed from this action—are the relevant entities to the properties at issue here, not Long's TCF National Holdings. (*Id.*) Plaintiff testified that he never met, spoke, communicated with Long directly. (Dkt. 241 ¶ 12).

As noted above, though, it is undisputed that Long (via TCF) took out a $803,400.00 mortgage for the $1,200,000 acquisition of four Fairview buildings (that jointly appraised for $1,325,000 on Dec. 3, 2021) inclusive of Haynes' properties on behalf of Defendants Long, Chojnacki, Rixer and former Defendant Sheth. (*Michel*, Dkt. 246 ¶ 80, 248 ¶ 80, 244 ¶ 80; Dkt. 239, Ex. 63). While it is undisputed that Fairview Avenue Properties LLC, and not TCF, held the actual titles, the extent of TCF's involvement is disputed: Long asserts that Mon Ami TCF LLC, was the manager-member of the Fairview Avenue Properties LLC during the relevant time period, whereas Plaintiff asserts that TCF indirectly owned the properties and Long herself authorized numerous related transactions, while Sheth was not actually involved in the acquisition or sale. (Dkt. 245 ¶ 80; Dkt. 243 ¶ 80; Dkt. 241 ¶¶ 5–6). Thus, this is a question of fact for a jury's resolution.

Finally, the analysis laid out in the related cases governs Long's contentions that the allegations of wire and mail fraud in the Amended Complaint are directed at other co-Defendants, not Long. (Dkt. 229-1 at 6). It is possible for a jury to find that Long was sufficiently engaged in the enterprise under § 1962(c) to be liable for the predicate acts despite not being central to the

direct encounters with Plaintiff; even if the jury found that Long had nothing to do with the predicate acts, though, Long could potentially still be liable under § 1962(d), which requires only that the defendant agree that "*someone* would commit at least two predicate acts to accomplish these goals" even if she herself does not. *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (emphasis added). (Long, in her Reply, argues that conspiracy was unpleaded (Dkt. 244 at 5), but the Amended Complaint appears to alternatively plead the conspiracy claim— § 1962(d)—in alleging "§ 1962(c), (d)." (Dkt. 29 ¶¶ 100–120). Of course, it is ultimately possible for a jury to find that the evidence showing that Long's joint venture purchased the Fairview properties and subsequently sold to Plaintiff merely indicated a business relationship. Yet the argument that NO reasonable jury could find for Plaintiffs on this claim is unpersuasive. Plaintiffs' evidence, though shaky at times, could sufficiently tie the Long Defendants to the enterprise (even aside from the prior romantic relationship with Long and Chojnacki, which would be insufficient on its own to meet this standard). The significant financial overlap, alleged lies regarding property ownership, entanglements disguising actual owners, and copious legal entities could allow a jury to infer the Long Defendants knowing participated in the scheme to saddle investors with misrepresented properties in order to make a quick buck.

As stated above, Plaintiffs cannot proceed on their "lost investment theory" and the Motions are granted with regard to the "front-end damages" undergirding that theory of injury. Drawing all inferences in favor of Haynes, however, the Motions for Summary Judgment on Count I are otherwise denied.

**I. State-Law Claims (Counts II–VI)**

Next, Chojnacki moves for summary judgment on Haynes' state law claims for common-law fraud (Count II), violation of the ICFA (Count III); violation of the IRELA (Count IV);

negligent misrepresentation (Count V); and unjust enrichment (Count VI). (Dkt. 233).[4] Plaintiffs' responses on the issues offer scant case law, instead broadly regurgitating the generalized animating grievances of the amended complaint. Accordingly, most of the state law claims cannot survive this stage in the litigation.

**a. Count II: Common Law Fraud and Count V: Negligent Misrepresentation**

"In order to establish fraud under Illinois law, a plaintiff must prove that (1) defendant made a false statement; (2) of material fact; (3) which defendant knew or believed to be false; (4) with the intent to induce plaintiff to act; (5) the plaintiff justifiably relied on the statement; and (6) the plaintiff suffered damage from such reliance." *Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir. 2000) (citing *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 619 (Ill. 1995)).

Negligent misrepresentation has essentially the same elements, except "the defendant need not know that the statement is false. His own carelessness or negligence in ascertaining its truth will suffice for a cause of action." *Doe v. Dilling*, 228 Ill. 2d 324, 360 (Illinois 2008). "For negligent misrepresentation, a plaintiff must also allege that the defendant owes a duty to the plaintiff to communicate accurate information." *Id.* (citing *Board of Education of City of Chicago v. A, C & S, Inc.,* 546 N.E.2d 580 (Illinois 1989)).

Starting with Count II: the Chojnacki Defendants highlight that there the only pre-closing conversations between Chojnacki and Haynes involved the properties he actually purchased, (Dkt. 233 at 8). Plaintiff makes no attempt to dispute this picture, returning instead to the general theory

[4] The Long Defendants also moved for summary judgment on Counts III, V, and VI, seemingly out of an abundance of caution, as Long's name was mentioned in the text of an ICFA claim that otherwise only references Chojnacki and Mikosz, as well as a negligent misrepresentation claim that does not allege Long to have actually made any statements. (Dkt. 229-1 at 8). Indeed, Plaintiffs do not acknowledge Long in their defense of either claim. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession). Thus, the Long Defendants' Motion for Summary Judgment on Count III, V, and VI is also granted, to the extent it is not moot via the lack of proper pleading.

of the 15 related cases rather than any specific allegedly false statements from the Chojnacki Defendants beyond a general statement that Chojnacki "boasted of his office." (Dkt. 242 at 19). Though the underlying asserted fact supporting this statement is itself disputed, generally boasting of an office's team members is insufficient as a matter of law. *See United States v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010) (at the summary judgment stage, it is "not the district court's job to sift through the record and make (a party's) case for him"). As courts have often admonished, "summary judgment is the 'put up or shut up' moment in the life of a case," *see, e.g.*, *In re Airadigm Communications, Inc.*, 616 F.3d 642, 657 (7th Cir.2010). It is neither required nor appropriate for the Court to "sift through the record and make [the] case for him." *See 5443 Suffield Terrace*, 607 F.3d at 510. Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count II.

Returning briefly to the negligent misrepresentation claim:[5] Plaintiff did not specifically allege a duty in the Amended Complaint. (Dkt. 27 at 24). Nor does Plaintiff meaningfully address the Defendants' arguments as to negligent misrepresentation in the Response with a single citation to case law. (Dkt. 242 at 21–22). Ultimately, though, what dooms Plaintiff's claim here is the same lack of prosecution that impedes the common law fraud claim. After the defendant has made its showing, the non-moving party must come forth with evidence showing what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). If the non-moving party fails to do so, summary judgment is proper. *United States v. Selenske*, 882 F.2d 220 (7th Cir.1989). Haynes does not make the requisite arguments here, and the court will not do it for him. *See Little*

[5] While Illinois law generally bars plaintiffs from asserting tort claims such as negligent misrepresentation where they seek to recover only economic losses, it is subject to certain exceptions where "one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations," an exception that has been applied to real estate brokers. *See Am. Inter-Fid. Corp. v. M.L. Sullivan Ins. Agency, Inc.*, 2016 WL 3940092, at *8 (N.D. Ill. July 21, 2016) (collecting cases). The named real estate broker on Haynes's sale contract was Mikosz herself, who has settled her claim with Haynes.

*v. Cox's Supermkts.*, 71 F.3d 637, 641 (7th Cir. 1995) (holding that the court "is not required to scour the party's various submissions to piece together appropriate arguments" as it "need not make the lawyer's case").

**b. Count III: ICFA**

In Count III, Plaintiff alleged that Chojnacki violated Illinois's consumer protection statute, the ICFA. *See* 815 ILCS 505/1–505/12. "To prevail on a claim under the ICFA, a plaintiff must plead . . . that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (quotation marks omitted). "The Illinois Consumer Fraud Act affords broader protection to consumers than the cause of action available under common-law fraud." *Letoski v. Coca-Cola Co.*, 753 F. Supp. 3d 650, 664 (N.D. Ill. 2024)*; Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 751 (Illinois 1994) ("[T]he intent of the Consumer Fraud Act was to lessen the burden of proof in a claim for certain misrepresentations."). "Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common law fraud." *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 898 N.E.2d 194, 203 (Ill. App. 2008) (citation omitted).

" 'Intent' under the Act means 'that the defendant intends for the plaintiff to rely on the deception' rather than 'the defendant's intent to deceive' under common-law fraud." *Letoski*, 753 F. Supp. 3d at 664. Conduct is deceptive "if it creates a likelihood of deception or has the capacity to deceive" a "reasonable consumer." *Benson*, 944 F.3d at 646. It is unfair if it offends public policy; is "immoral, unethical, oppressive, or unscrupulous"; and causes substantial injury to consumers. *Id.* at 647.

A buyer must prove either 1) "the buyer would have acted differently knowing the information" or the act "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203 (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 584 (Illinois 1996)). "Furthermore, a plaintiff's actual reliance is not required, but a plaintiff must show that defendant's consumer fraud proximately caused their injury." *Id.*

Here, a reasonable jury could find that Chojnacki's behaviors, even if often one-step-removed from direct communication with Haynes (left for Mikosz to handle), was designed to induce Haynes's reliance on the inefficient and old-school seller narrative in order to secure a future profit on properties that Defendants had not yet purchased themselves. In Response, Plaintiff points to some behavior that is perfectly legal, such as identifying longtime owners and offering them opportunities to sell. (Dkt. 294 at 21). But Plaintiff also has presented evidence of a potential scheme to convince sellers of a bargain real estate deal that simultaneously provided Defendants with a near-guaranteed investment opportunity. (*Id.*) A jury could find that the scheme alleviated some of the traditional risks of real estate investments for Defendants—namely, the ability to flip the property for a profit—by ensuring a buyer was ready to go on the flip before Defendants even finalized their initial purchase. On this record, it remains disputed whether Chojnacki's conduct "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase." *Hanson-Suminski*, 898 N.E.2d at 203.

Defendants also contend that Shankar has presented no evidence of damages because he has not sufficiently tied damages to this part of his claim. (Dkt. 246 at 12). Yet Haynes has offered some evidence on the alleged six-figure damages from unexpected repairs, unexpected code compliance, unexpected building code violations and evictions, and it is up to the jury to assess

the validity, if any, of that sum. In analyzing a claim under the Illinois statute, courts consider "the totality of the information made available to the plaintiff." *Benson*, 944 F.3d at 646 (citing *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005)). That inquiry, by its definition, will peer beyond the singular "seller's identity" quotation to assess the full picture available to Haynes in his dealings with Defendants.

**c. Count IV: Illinois Real Estate License Act**

Under the Illinois Real Estate License Act, licensees "shall treat all customers honestly and shall not negligently or knowingly give them false information." 225 Ill. Comp. Stat. Ann. 454/15-25. "A licensee engaged by a seller client shall timely disclose to customers who are prospective buyers all latent material adverse facts pertaining to the physical condition of the property that are actually known by the licensee and that could not be discovered by a reasonably diligent inspection of the property by the customer." *Id.* The Act "protects real estate licensees when they make false statements if the false information was provided by the property owner and the broker had no reason to believe the information was incorrect." *See Aharon v. Babu*, 2023 WL 2214429, at *6 (N.D. Ill. Feb. 24, 2023). In other words, it requires a plaintiff to prove "that the false information (i) did not come from the seller, (ii) was material to the buyer, and (iii) caused damages." *Edson v. Fogarty*, 138 N.E.3d 238, 246 (Ill. App. 2019).

Defendants acknowledge that Haynes was "a customer," and thus, under the Act, Chojnacki had a duty to refrain from supplying him false information. (Dkt. 233 at 11). Instead, they argue that "According to Haynes himself, Chojnacki did not supply him *any* information." *Id.* Chojnacki also contends that "there is no evidence of latent material adverse facts pertaining to the physical conditions that he actually knew about that could not be discovered by reasonably diligent

inspection of the property," and thus he complied with Section 15-25 of the Illinois Real Estate Licensing Act. (*Id.* at 12).

Rather than engage with this contention on the substance, Plaintiff recites the general theory of the case with conclusory assessments, declaring the arguments "without merit" and following that with an excerpt from a expert report and general references to dozens of exhibits without citation, the majority of their 56.1 statement, and zero references to case law. (Dkt. 242). Mere conclusory assertions, whether made in pleadings or in affidavits, are not sufficient to defeat a proper motion for summary judgment. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985).

"Judges are not like pigs, hunting for truffles buried in" the record. *Albrechtsen v. Bd. of Regents*, 309 F.3d 433, 436 (7th Cir. 2002). Thus, the Court will not "address those arguments which it finds incomprehensible." *Pope v. United States*, 2012 WL 5389807, at *2 (N.D. Ill. Nov. 1, 2012) (citing *Smith v. Town of Eaton, Ind.*, 910 F.2d 1469, 1470-71 (7th Cir. 1990)); *United States v. Anzaldi*, 2013 WL 393326, at *5 (N.D. Ill. Jan. 31, 2013) ("the Court refuses to address nonsensical arguments") (citing *Morton v. Greer,* 61 F.3d 906, 906 (7th Cir. 1995) (stating that briefs which contain no identifiable argument will be dismissed)); *Schramm L. Grp., LLC, v. Pitney Bowes Inc.*, 2026 WL 636820, at *2 (N.D. Ill. Mar. 6, 2026) ("The Court needn't consider . . . 'underdeveloped, conclusory, and undeveloped' argument[s].") (cleaned up) (quoting *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)); *United States v. Vance*, 2022 WL 1831138, at *1 (7th Cir. June 3, 2022) ("courts need not address arguments . . . that are 'too weak to require discussion' ") (quoting *United States v. Joiner*, 988 F.3d 993, 995 (7th Cir. 2021)); *Smith,* 910 F.2d at 1470–71 (the Court "cannot be called upon to supply legal research and organization to

flesh out a party's arguments"). Accordingly, the Chojnacki Defendants are entitled to summary judgment on Count IV.

**d. Count VI: Unjust Enrichment**

That leaves the final state-law claim: Count VI: unjust enrichment. Both sets of Defendants moved for summary judgment on Count VI. As they did in *Stafford* and *Chen*, Plaintiffs' attorneys once again incorrectly claim that Defendants' argument "relies entirely" on *Community Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018), a case featured in the Long Defendants' brief (Dkt. 229 at 11), without acknowledging the case law in the Chojnacki Defendants' brief (Dkt. 229 at 13). Even so, Plaintiffs' contentions are misinformed. As this Court has already spelled out in *Malik*, Illinois law does not consider unjust enrichment an independent cause of action. *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir. 2019) (finding no standalone claim for unjust enrichment under Illinois law); *Flores v. Aon Corp.*, 242 N.E.3d 340, 356 (Ill. App. 2023) (quoting *Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.*, 484 N.E.2d 349 (Ill. App. Ct. 1985), *aff'd*, 499 N.E.2d 1319 (Ill. 1986)).

To the extent that the unjust enrichment claim is premised on the ICFA, the unjust enrichment claim can survive dismissal with regard to the Chojnacki Defendants. *See id.* at 741–42; *Ass'n Ben. Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent *claim* of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."). The unjust enrichment claim is barred as a tag-on to the alternative state law claims for the Chojnacki Defendants. Similarly, because there are no alternative state law claims as to Defendant Long, her Motions is granted with regard to Count VI. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 20 F.4th 311, 324 (7th Cir. 2021). ("To

the extent that the unjust enrichment claim is premised on the ICFA or [common-law fraud] claims, the unjust enrichment claim cannot survive the proper dismissal of those matters.”).

## CONCLUSION

For the below reasons, the Chojnacki Defendants’ Motion for Summary Judgment [232] and Long’s Motion [229] are granted in part and denied in part. The Motions are granted with regard to Plaintiff’s attempt to proceed under 18 U.S.C. § 1964 on a theory of speculative profit loss; they are otherwise denied as to the RICO claims, which remain in the case in accordance with the analysis herein. The Court also grants the Long Defendants’ Motion on Counts III, V, and VI. The Court also grants the Chojnacki Defendants’ Motion with regard to common-law fraud (Count II); violation of the IRELA (Count IV); and negligent misrepresentation (Count V); it denies the motion as to violation of the ICFA (Count III) and the follow-on claim of unjust enrichment (specifically for the Chojnacki Defendants) (Count VI), which remain in the case and will proceed to trial unless the parties can reach a settlement.

Virginia M. Kendall
United States District Judge

Date: September 9, 2026